United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC ARDOIN, | No. C-11-5564 EMC (pr) |
| Petitioner, | |
| v. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| MIKE McDONALD, | |
| Respondent. | |

## I. INTRODUCTION

Petitioner seeks federal habeas relief from his state convictions. For the reasons stated herein, the petition for such relief is **DENIED**.

## II. BACKGROUND

In 2007, a San Francisco County Superior Court jury convicted Petitioner and co-defendant Albert Jaquez, of first degree murder, consequent to which Petitioner received a sentence of 85 years-to-life in state prison. The state appellate court, which issued the last reasoned decision, affirmed his conviction on direct review. The state supreme court summarily denied his petition for direct review. This federal habeas petition followed.

Evidence presented at trial demonstrated that in 2003 Petitioner and Jaquez killed Rodney Tom, a drug dealer and Jaquez's upstairs neighbor and landlord. The primary prosecution witness

///

///

///

was Jaquez's wife, Rebecca Burgos,[1] whose testimony regarding the murder was summarized by the state appellate court as follows:

> She parked her car in the driveway [of Tom's house] and walked through the open gate to the front door, which atypically was not locked. Burgos saw [Petitioner] standing in front of their in-law apartment, looking up the stairs toward Tom's residence. Suddenly, Burgos was grabbed from behind in the entryway, thrown to the ground on her stomach, and "hogtied" with her hands bound to her ankles with a rope. She did not see the person who restrained her. Burgos struggled, and heard a voice which she recognized as that of Jaquez tell her to "get down" and "just stay still." After she was restrained, Burgos also saw [Petitioner] "go up the stairs" with a "Halloween Jason mask" on his face.
>
> From upstairs Burgos heard pounding, banging, scuffling and odd "snapping" noises. She also heard Tom repeatedly say, "I don't have anything." Burgos yelled to Tom: "Rodney, if you have anything, please give it to him, please give it to him." She continued to hear banging, and Tom stated, "There, now go." After Tom yelled, "Here they come," and banged his foot, "it got quiet." [Petitioner] then came down the stairs with Tom's "tackle box that he kept his drugs in." He stepped over Burgos, walked out of the front door, and left.
>
> Burgos struggled to release her arms from the rope and untie her ankles. She went up the stairs to "check on" Tom in his bedroom. Tom was lying on his stomach with a piece of carpet over his head. Burgos approached Tom and noticed "a slash in his throat" and "a lot" of blood under his head.

(Ans., Ex. 8 at 4–5.) Petitioner's asserted his innocence at trial of the killing or robbery, which were apparently committed, he averred, by Burgos. (*Id.* at 10–11.)

Burgos's testimony was corroborated by that of Preston Ely, who "was acquainted with defendants and saw both of them frequently in July of 2003, usually about drugs":

> Ely often lived in his half-ton van that he parked "off of Third Street," near Jamestown Avenue, in the Bayview District. Ely acknowledged that he used and sold drugs. Ely testified that between 10:00 and 11:00 on the morning of July 10, 2003, Jaquez, whom he knew as "Beto," arrived unexpectedly and asked to "trade cars." Ely agreed, and exchanged his brown Ford Granada for Jaquez's Mitsubishi van. Ely also agreed to loan Jaquez his cell phone in exchange for speed and crack cocaine.

---

[1] In exchange for her testimony, Burgos, pursuant to a negotiated disposition, entered a plea of guilty to being an accessory after the fact to the murder. Initially she had been charged along with Petitioner and Jaquez with the murder of Tom. (Ans., Ex. 8 at 3 n.3.)

2

> Later that evening Jaquez visited Ely in his room at the Franciscan Motel on Third Street. Jaquez complained that Ely's Ford Granada "ran out of gas" in McLaren Park, and Jaquez left it there. Jaquez told Ely that he had seen his landlord, a "Chinese dude" who lived upstairs from him, "lying there with his throat cut." Jaquez stated that he was "having problems getting drugs" from Tom, and was "being put out" of his residence for failing to pay rent. Jaquez received phone calls while he was at Ely's motel room. He became "very upset," and "started crying." In reference to the "Chinese dude getting killed," Jaquez told Ely, "I didn't do it, it wasn't me. It wasn't supposed to happen." Jaquez also mentioned that he had placed duct tape on a woman in McLaren Park and "that he was going to call the police" to "come get her and use that as an alibi."

(*Id.* at 8–9.) Also, Petitioner's blood was found under Tom's fingernails. (*Id.* at 6.)

As grounds for federal habeas relief, Petitioner claims that (1) the trial court gave supplemental instructions that violated his right to counsel and to due process; (2) his Confrontation Clause rights were violated; (3) the trial court violated his right to due process and to confront witnesses by excluding certain evidence; and (4) there was cumulative error.

### III. STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the

3

facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

## IV. DISCUSSION

A.  Alleged Instructional Error

Petitioner claims that the trial court violated his right to due process by giving the jury supplemental instructions in the midst of deliberations. He cites two federal cases, *Sheppard v. Rees*, 909 F.2d 1234 (9th Cir. 1989) and *U.S. v. Gaskins*, 849 F.2d 454 (9th Cir. 1988), in support of his claims.

The state supreme court summarized the facts as follows:

> [Petitioner]'s contention requires that we engage in a recitation in some detail of the rather convoluted procedural history of the case that culminated in the challenged felony-murder instructions. [Petitioner] was charged with first degree with malice aforethought as the direct perpetrator of the murder of Tom, and the case against him proceeded on that theory at trial. Codefendant Jaquez, in contrast, was charged with and prosecuted under aiding-and-abetting and felony-murder theories.
>
> Nevertheless the evidence presented at trial was also susceptible to interpretations that both defendants directly and conjointly participated in the robbery and murder of the victim, or that either of them may have perpetrated the robbery and aided and abetted the other to commit the murder. During closing argument, the prosecutor thoroughly discussed the felony-murder and aiding-and-abetting theories, with reference to Jaquez, but also without delineation of which of the two codefendants was guilty under those theories. [Petitioner] was characterized by the prosecutor as the "perpetrator" or the "lead in this killing."
>
> Defense counsel emphasized during closing argument that [Petitioner] did not have the "physical capacity" to restrain and assault the victim. Counsel suggested that in light of [Petitioner]'s documented physical infirmities the prosecution had been forced to "abandon" the theory that he personally "subdued and killed" Tom in favor of a "speculative theory" that he "wasn't necessarily the killer," but instead "somehow helped" with the murder. Counsel mentioned "two scenarios" presented by the prosecution in the case: one that indicated [Petitioner] was "a killer," and the other that sought to convict him as

4

an "aider or abettor and not actually the killer." Counsel also argued that the prosecutor "changed the theory" of murder against [Petitioner] to "aiding and abetting." Then, defense counsel proceeded to engage in argument, with references to the evidence, that the prosecution failed to prove the "new aiding-and-abetting theory" that was "based only on speculation" and was contrary to the testimony of prime prosecution witness Burgos. Therefore, defense counsel presented these alternative theories in his attack on the strength of the prosecution's case against [Petitioner].

During rebuttal argument the prosecutor underscored that both codefendants, and perhaps Burgos as well, had a "role" in Tom's death. The prosecutor advised the jurors to find that if defendants pursued a "concerted action" to murder Tom, they could both be found guilty under either the felony-murder rule or as direct perpetrators of the offense. Review of the transcripts convinces us that counsel for the prosecution and [Petitioner] posited the legal theories of murder (premeditation and felony-murder) in their arguments.

Following argument, the felony-murder and aiding-and-abetting instructions (CALCRIM Nos. 540B and 401) agreed upon by the parties and given to the jury referred only to Jaquez. However, all counsel were aware of, and had settled on, the jury instructions before final argument began. The court also instructed the jury that each charge against each defendant must be considered separately, and: "Unless I tell you otherwise or unless it's stated in the instructions, all instructions apply to each defendant."

During deliberations, the jury asked in a note given to the court: "If we believe that [Petitioner] was not the perpetrator of the murder, can we still find him guilty under a theory of felony murder, or otherwise?" The prosecutor suggested that the court either reply in the affirmative, with reference to CALCRIM No. 540B, or further instruct the jury in some form that the principles of CALCRIM No. 540B "are applicable to . . . any charged defendant" in the case. Defense counsel objected on several grounds: first, that the prosecution proceeded on the theory that [Petitioner] was "the direct perpetrator," and the evidence did not support a felony-murder theory against him; second, that closing argument on behalf of [Petitioner] was based on the concept that the felony-murder theory did not include him; and third, that to "essentially change the instructions" to include [Petitioner] in the felony-murder theory "would be prejudicial" to him since the defense "did not argue the issue." The defense recommended that the court merely refer "the jury to all the instructions in their entirety as to what legal bases they can use" to find [Petitioner] "either guilty or not guilty."

The trial court noted that the reference to Jaquez alone in the CALCRIM No. 540B instruction was some form of computer "program" error that failed to include both defendants. The court proposed to clarify CALCRIM No. 540B by advising the jury that the instruction "is applicable to any charged defendant." Defense counsel continued to object to "applying the felony-murder theory now" to [Petitioner], based on the lack of substantial evidence to support it, and the "lateness of the application of the theory of liability to him after

5

closing argument." The trial court decided to further instruct the jurors that they "may only find the defendant guilty under the instructions provided," and that the "felony-murder instruction may apply to either defendant if the jury finds that each of the elements has been proven." Regrettably, the original trial court judge left on vacation before responding to the jury.

At the next court session, [Petitioner]'s counsel moved for a mistrial or to reopen argument, while the jury reaffirmed the need for guidance on the issue of the felony-murder rule as applied to [Petitioner]. After reviewing the previously given instructions and particularly the closing arguments given by defense counsel, the substitute trial judge observed that defense counsel referred on "numerous occasions" to aiding and abetting as a "new theory" in the case. Despite counsel's protest that his aiding and abetting closing argument was "in passing," and would have been more thorough, particularly as to the "intent element" of aiding and abetting, the "specifics" of the evidence of encouraging or promoting the crime, and the natural and probable consequences aspect of the felony-murder rule, the defense motion for mistrial or to reopen argument was denied.

A "new and revised" CALCRIM No. 540B instruction was given to the jury that, the court explained, "replaces the instruction that was given to you originally." Instead of referring only to *Jaquez*, the instruction stated: "The defendants are charged with murder. *All defendants may be guilty of murder under a theory of felony murder*, even if another person did the act that resulted in the death." (Italics added.) FN8[.] The court then proceeded to repeat the elements of felony murder previously stated in the CALCRIM No. 540B instruction.

FN8. The original instruction read: "Now, the defendant *Albert Jaquez* is charged with murder under the theory of felony murder. The defendant *Albert Jaquez* may be guilty of murder under the theory of felony murder, even if another person did the act that resulted in the death." (Italics added.)

(Ans., Ex. 8 at 22–25.)

The state appellate court rejected Petitioner's claims of lack of notice, the propriety of the instruction, and the failure to reopen argument. As to the question of notice, the appellate court reasoned that Petitioner received sufficient notice when he was first charged with murder:

We begin our analysis with the observation that despite the failure of the prosecution to specifically charge [Petitioner] with murder committed in the course of an enumerated felony in violation of section 189, he was not denied his notice or due process rights when the trial court gave felony-murder and aiding-and-abetting instructions to the jury. [Footnote omitted.] The California Supreme Court has repeatedly and definitively declared that felony murder (§ 189) and premeditated murder (§ 187) are not separate crimes, but rather different varieties of the same crime, so a defendant may be convicted

> of felony murder even though the information charged only murder with malice. [Citations omitted.] "[A]lthough the two forms of murder have different elements, only a single statutory offense of murder exists. Felony murder and premeditated murder are not distinct crimes, and need not be separately pleaded." [Citation omitted.] From the murder charge and the evidence adduced at the preliminary hearing and at trial [Petitioner] received constitutionally adequate notice of the necessity to defend against a felony-murder theory of liability. [Citations omitted.] Thus, the trial court correctly instructed on felony murder, and the jury, in returning a general verdict for first degree murder, did not improperly convict [Petitioner] of an uncharged offense. [Citation and footnote omitted.]
>
> Further, the jury was not required to agree unanimously whether defendant was the actual perpetrator of the murder or the other participant in the crime. [Citations omitted.] "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] [*sic*.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator." [Citations omitted.] The instructions were supported by the evidence, and nothing in the record indicates that the jury was confused by the instructions. [Citation omitted.] Viewed in the abstract, the felony-murder instructions did not violate [Petitioner]'s federal constitutional rights to due process, notice, proof beyond a reasonable doubt, or a unanimous verdict. [Citation omitted.]

(*Id.* at 25–27.)

As to the question whether it was proper to give the supplemental instruction, the appellate court concluded the trial court had an obligation, when asked, to guide the jury with information "it desires on points of law." It also had a duty to instruct "on the law relevant to the issues raised by the evidence":

> Although the prosecution pursued what it viewed as the strongest case against [Petitioner] by arguing that he was the actual killer, the evidence presented at trial also suggested the jury might find him guilty under the felony-murder rule as a perpetrator of the robbery and aider and abettor of the crime committed by another. Despite the focus of the prosecution and defense theories of the case, the court properly modified the felony-murder instruction in accordance with the evidence presented by including a reference to both defendants. [Citations omitted.] "[T]he court is not precluded from giving any instruction for which there is evidentiary support. The fact that a party did not pursue a particular theory does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate." [Citation omitted.] The trial "'judge must always be alert to the possibility that counsel in the course of argument may have befuddled the jury as to the law. If this occurs, then either at the time the confusion arises or as part of the final instructive process the judge should rearticulate the correct rule of

7

> law.'" [Citations omitted.] The court has "a duty to reinstruct if it becomes apparent that the jury may be confused on the law." [Citation omitted.] Thus, we find that upon the jury's inquiry in the present case the trial court acted properly by reading the modified felony-murder instruction to dispel confusion and correctly advise the jury on the law governing the case. [Citations omitted.]

(*Id.* at 28–29.)

Then the state appellate court turned to the most troubling issue, whether Petitioner's rights to due process and counsel were violated when the trial court failed to reopen argument after giving the supplemental instruction. The court ultimately rejected Petitioner's claim for relief, even under *Sheppard* and *Gaskin*:

> We cannot dispute the premise, however, that once the trial court decided to clarify the felony-murder instruction to include both defendants, fairness dictated that the court also reopen the case for the limited purpose of granting [Petitioner]'s counsel the right to offer rebuttal argument. [Citation omitted.] To prevent unfair prejudice, if a supplemental instruction introduces new matter for consideration by the jury, the parties should be given an opportunity to argue the theory. [Citation omitted.] "The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution guarantee a criminal defendant the right to the effective assistance of counsel at all critical stages of the proceedings." [Citation omitted.] "'To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges.'" [Citation omitted.] If supplemental or curative instructions are given by the trial court without granting defense counsel an opportunity to object, and if necessary, offer additional legal argument to respond to the substance of the new instructions, the spirit of section 1093.5 and the defendant's right to a fair trial may be compromised. [Citations and footnote omitted.]
>
> To support his claim of prejudicial denial of the rights to effective assistance of counsel and due process, [Petitioner] relies primarily [*Sheppard* and *Gaskin*]. [Citations and footnote omitted.]
>
> In *Sheppard*, the defendant was charged with murder and prosecuted on the sole theory the killing was premeditated, willful and deliberate. As in the case before us, the defendant was not charged with robbery. Just prior to closing arguments, the prosecutor requested instructions on robbery and felony murder, which were given over the defendant's objection. [Citation omitted.] The trial court instructed the jury on a felony-murder theory and the prosecutor argued that theory to the jury during closing arguments. [Citation omitted.] The Ninth Circuit Court found that the defendant's right to due process and the effective assistance of counsel had been denied by the procedure, with the explanation: "A trial cannot be fair unless the nature of the charges against a defendant are adequately made known to him or her in a

8

timely fashion. [Citation.] [*sic*.] Here, the prosecutor 'ambushed' the defense with a new theory of culpability after the evidence was already in, after both sides had rested, and after the jury instructions were settled. This new theory then appeared in the form of unexpected jury instructions permitting the jury to convict on a theory that was neither subject to adversarial testing, nor defined in advance of the proceeding. [¶] Moreover, the right to counsel is directly implicated. That right is next to meaningless unless counsel knows and has a satisfactory opportunity to respond to the charges against which he or she must defend." [Citation omitted.] The court reversed the conviction, concluding it could not "regard as fair a trial in which the defendant's right to defend was impaired by a lack of notice as to the nature and cause of the accusation." [Citation omitted.]

And in *Gaskins*, [citation omitted], in the course of discussion of instructions on charges of possession of methamphetamine and manufacturing methamphetamine the prosecutor requested an instruction on aiding and abetting. In response, defense counsel requested a special instruction on unanimity to inform the jurors that their verdict must be unanimous on the theory of the defendant's guilt – as either a principal or as an aider and abettor – but ultimately counsel agreed with the trial court's decision not to give either instruction. [Citation omitted.] During deliberations the jurors sent the court a question which suggested they were considering an aiding and abetting theory of culpability on the charge of manufacturing methamphetamine, based on evidence that the manufacturing process occurred on the defendant's property. Over defense counsel's objection the trial court instructed on aiding and abetting. The trial court also denied requests by defense counsel to instruct on unanimity and to reopen closing arguments to address the aiding-and-abetting theory of culpability. [Citation omitted.]

The court in *Gaskins* found that the trial court's procedure violated federal rule 30(b), which like section 1093.5 requires defense counsel to be informed of proposed instructions prior to closing arguments, so counsel has "the opportunity to argue the case intelligently to the jury." [Citation omitted.] The court declared that noncompliance is "reversible error, however, 'only if counsel's closing argument was prejudicially affected thereby.' [Citation omitted.] Under this standard prejudice is found "if the party was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments." [Citation omitted.] The court thus focused upon "whether the district judge's decision to give the aiding and abetting instruction during jury deliberations, after initially stating ... that he would not, unfairly prevented Gaskin's counsel from arguing against an aiding and abetting theory to the jury." [Citation omitted.] The court observed that "convicting a defendant as a principal or convicting a defendant as an aider and abettor are based on two conceptually different theories." [Citation omitted.] The convictions were therefore reversed when review of the transcript of closing argument revealed that "Gaskin's counsel did not address the question whether providing a location for the laboratory, without more, would constitute aiding and abetting the manufacture of methamphetamine. Instead, her argument focused on the question whether her client had directly participated in the manufacturing

9

process. Moreover, she did not argue the facts as they would relate to the principle that 'mere presence' at the scene of a crime and knowledge that a crime is being committed is not sufficient to establish that an accused aided and abetted, unless the prosecution proves beyond a reasonable doubt that the defendant was a participant, and not merely a knowing spectator." [Citation omitted.]

Even if the error . . . occurred in the present case, the prejudice did not. First, as we have observed, through the first degree murder charge and evidence presented at trial [Petitioner] was provided with notice of his potential culpability under the felony-murder rule as an aider and abettor of the murder committed by another during the course of a felony. [Citations omitted.] "'[A] defendant, charged with murder, is on notice that the prosecution may seek to prove that charge by showing that the homicide occurred during the commission of an enumerated felony.'" [Citations omitted.] Nor did the trial court affirmatively advise the defense that [Petitioner] was excluded from the felony-murder instruction, in contrast to the misleading assurance given to defense counsel in *Sheppard*. [Citation and footnote removed.] The revision of the instruction in response to the jury's inquiry alleviated the trial court's failure to include both defendants in the original felony-murder and aiding-and-abetting instructions, a mistake which may have happened inadvertently.

The record also convincingly illustrates to us defense counsel's awareness during argument that felony-murder and aiding-and-abetting principles were at issue in the case. [Citation omitted.] The evidence offered at trial disclosed and repeatedly confirmed that the murder occurred during the course of the robbery of drugs from the victim. [Citations omitted.] In closing argument the prosecutor referred to felony-murder and aiding-and-abetting principles, on some occasions without singling out Jaquez. Again in contrast to both *Gaskins* and *Sheppard*, in response the defense did not focus exclusively on contesting the evidence of [Petitioner]'s direct participation in the murder. [Citation omitted.] [Petitioner]'s primary defense was that he was not present at all when the murder occurred, and therefore was neither the perpetrator nor the aider and abettor of the robbery and murder.

Defense counsel expressly mentioned the prosecutor's position that [Petitioner] may be guilty under either of "two scenarios" presented by the evidence: as the direct "killer" of the victim, or as an "aider or abettor and not actually the killer." Defense counsel supported his ensuing argument that the aiding-and-abetting theory was "speculation" with numerous assertions based on the prosecution's failure to prove the elements of felony murder and aiding and abetting: the evidence did not prove [Petitioner] was even at the scene "prior to and at the time of death" of the victim; the chief prosecution witness Burgos, who placed him at the scene, lacked any credibility; the phone and cab ride records supported the defense claim that [Petitioner] was not present when Tom was robbed and killed; [Petitioner] lacked "physical capability" to kill the victim or assist with the killing; Burgos did not see [Petitioner] rob the victim or "help somebody" do so; the DNA evidence was "circumstantial" and not dispositive of [Petitioner]'s guilt under any theory. Later in closing argument

10

> defense counsel reiterated that the prosecution offered a "new aiding-and-abetting theory," and again emphasized the "absence" of evidence to support it: the mere "speculation" that [Petitioner] arrived at Tom's house before the murder; the lack [of] evidence that Tom's drugs were found in [Petitioner]'s home or that he sold drugs after the murder; that [Petitioner] did not go to a hotel, attempt to flee, or concoct a fabricated version of the murder, as did Jaquez and Burgos; and that [Petitioner] did not have a "compelling motive" to participate in a robbery of Tom.
>
> The belatedly clarified supplemental felony-murder instruction thus did not introduce any new and different theory or factual elements into the case to be contested by the defense. [Citations omitted.] At oral argument [Petitioner] stressed the distinction between the theories of aiding and abetting and felony murder. He further pointed out that only aiding and abetting was mentioned as a basis of liability during closing argument. He is of course correct that aiding and abetting and felony murder are different theories upon which criminal liability may be based. [Citation omitted.] For purposes of opportunity to present argument in the present case, however, the robbery and homicide were part of a single, continuous transaction, which brought into operation the felony-murder rule's imposition of culpability for the homicide as an accomplice to the robbery. [Citation omitted.] Nor was the jury called upon to decide whether [Petitioner]'s guilt was due to his acts as the direct perpetrator of the robbery and murder, or instead as an aider and abettor of the robbery that resulted in the murder by another. "'It matters not that jurors may disagree over the theory of the crime, for example, whether the situation involves felony murder or premeditated murder. Nor does it matter that they disagree on the theory of participation, for example, whether there was direct participation or aiding and abetting or coconspiracy.'" [Citation omitted.] In the context of the facts and legal principles presented, argument on felony-murder and aiding and abetting theories were not distinctive in the case.
>
> . . . In short, counsel was not ambushed by the modified instruction. He adequately addressed the alternative felony-murder and aiding-and-abetting theories of liability during his final argument.

(*Id.* at 29–36.)

Petitioner's claims are denied because this Court cannot say that the state appellate court's decision was unreasonable under AEDPA. First, the Court addresses the applicability of *Sheppard* and *Gaskin*. These cases are Ninth Circuit, not Supreme Court, precedent and therefore do not constitute clearly established federal law under AEDPA. *Renico v. Lett*, 130 S. Ct. 1855, 1865–66 (2010). Also, for the reasons stated by the state court of appeal, they are distinguishable.[2]

---

[2] This point becomes more significant in light of the fact that the Ninth Circuit has concluded that *Sheppard* is a narrow ruling, restricted to its specific facts. *Stephens*, 59 F.3d at 935.

11

1  Furthermore, it is noteworthy that in the instant matter, the jury asked for further instruction,
2  whereas in *Sheppard*, the prosecutor requested a late instruction without any jury request. As the
3  court of appeal in the instant case noted, the trial judge in this case was duty bound to respond to the
4  jury. *Gaskin* is also inapposite because it involved the application of a federal rule in a trial on
5  federal drug charges, not the application of constitutional law.

6  Second, the Court turns to the question of notice and prejudice. As regards the issue of
7  notice, it is true that due process "guarantees a criminal defendant the fundamental right to be clearly
8  informed of the nature and course of the charges in order to permit adequate preparation of a
9  defense." *Stephens v. Borg*, 59 F.3d 932, 934–35 (9th Cir. 1995) (citation omitted); *see also Gray v.
10 Raines*, 662 F.2d 569, 571 (9th Cir. 1981). However, it is a well-established rule in California that
11 "a pleading charging murder adequately notifies a defendant of the possibility of conviction of first
12 degree murder on a felony-murder theory," even if the pleading does not expressly state such a
13 theory of criminal liability. *See People v. Gallego*, 52 Cal. 3d 115, 188 (Cal. 1990) (en banc), *cert.
14 denied*, 502 U.S. 924 (1991). Federal habeas petitions alleging the same notice claim advanced in
15 the instant petition have been denied, citing *Gallego*. *See Stephens*, 59 F.3d at 935; *see also
16 Morrison v. Estelle*, 981 F.2d 425, 427 (9th Cir. 1992).

17 As regards the question of prejudice, whether under due process or the right to counsel,
18 Petitioner has made no such showing. First, his defense at trial was that he was entirely uninvolved
19 in the crimes – he was not there, he did not commit the charged acts. Had that defense changed if
20 argument had been reopened following the supplemental instruction, Petitioner would have
21 jeopardized any hope of mistrial or acquittal. Put another way, claiming innocence is an all-or-
22 nothing defense. To claim actual innocence to murder ("I killed no one") under one theory, yet
23 abandon that defense under a second murder theory is nonsensical. Second, Petitioner has not
24 shown what additional arguments or facts defense counsel could have presented as a defense to
25 felony murder. The prosecution presented evidence that "the robbery and homicide were part of a
26 single, continuous transaction, which brought into operation the felony-murder rule's imposition of
27 culpability for the homicide as an accomplice to the robbery." Furthermore, Petitioner's counsel
28 squarely addressed the aiding and abetting theory in closing argument. This Court cannot say that

these legal and factual determinations made by the state appellate court in rejecting this claim were unreasonable. Accordingly, the state appellate court's decision is entitled to AEDPA deference, and Petitioner's claims are hereby DENIED.

B.   Confrontation Clause

Petitioner claims that the trial court violated his Confrontation Clause rights by denying his mistrial motion following Burgos's reference to an extrajudicial statement of Jaquez. The relevant facts are as follows:

> The challenged testimony by Burgos was elicited in the context of the prosecutor's effort to obtain an explanation for her decision to ultimately testify against Jaquez and "tell the truth about what happened." Burgos testified that she "waited three years for somebody to say something" that exonerated her. Specifically, Burgos objected to the failure of Jaquez to follow through with his assurance to her that he "would talk to the person" who committed the murder and "have them stand up and say what they did." Upon defense counsel's objection the trial court struck the portion of Burgos's testimony that referred to "any persons" other than her or Jaquez, and admonished the jury "not to consider that portion of the testimony for any purpose whatsoever." Defense counsel also asserted that prosecutorial misconduct had been committed and moved for a mistrial. The trial court found that the prosecutor did not adduce the testimony intentionally, and denied the motion for mistrial on the ground that the admonition "cured the problem."

(Ans., Ex. 8 at 36–27.)

The state appellate court rejected Petitioner's claim:

> Here, Burgos's reference to the statement by Jaquez did not mention [Petitioner] by name. Burgos reported that Jaquez told her he "would talk to the person" who committed the murder, and "have *them*," apparently referring to both Jaquez and the other person, "stand up and say what *they* did." (Italics added.) Jaquez's statement thus made a direct reference to a perpetrator other than the speaker, but the statement was intrinsically redacted. On her own, Burgos replaced [Petitioner]'s name with the pronouns "person" and "they."
>
> . . . Several factors strike us as limiting both the incriminating nature of the statement and the risk that a jury could not follow the trial court's instruction to disregard the evidence. First, the extrajudicial statement by Jaquez is neither testimonial in nature under *Crawford v. Washington* (2004) 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177, nor a powerfully incriminating confession. Jaquez gave an assurance to Burgos that he and the other person responsible for the murder would come forward and "say something" to exculpate her. Nothing in the evidence constitutes an overtly incriminating confession. Second, the statement is not directly or "facially"

13

> incriminating. [Citation omitted.] The inference is concededly obvious that Jaquez was referring to [Petitioner] as the coparticipant designated in the statement, but reference to the remainder of Burgos's testimony is necessary to fully recognize the incriminating nature of the statement. Moreover, the statement was not hearsay evidence, as it was not offered for the truth of the matter, but only to reflect upon the witness's state of mind and the reasons that convinced her to "change [her] mind" and testify against defendants.
>
> The trial court's instruction thus alleviated the harm associated with the obliquely incriminating statement.

(*Id.* at 39–40) (footnotes omitted).

Petitioner claims that Burgos's testimony violated his Confrontation Clause rights as they are described in *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the United States Supreme Court declared that a defendant is deprived of his Sixth Amendment right of confrontation when a facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. *Id.* The Court refined its *Bruton* holding in *Richardson v. Marsh*, 481 U.S. 200 (1987). In *Richardson*, the Court held that the admission of a nontestifying codefendant's confession with a proper limiting instruction when the confession was redacted to eliminate the defendant's name and any reference to his existence did not violate the Confrontation Clause. *Id.* at 206–07.

Petitioner's claim is without merit. Burgos's testimony did not directly implicate Petitioner. "[T]hem" and "they" made the statement, as the state court said, "intrinsically redacted." Nor did the statement necessarily imply there would be an admission of guilt by "them." On such a record, there was no *Bruton* violation, a conclusion bolstered by the trial court's instructions to the jury, which is presumed to follow its instructions, even under these circumstances. *Marsh*, 481 U.S. at 211. As there was no constitutional violation, the state court's decision was reasonable and is entitled to AEDPA deference.

Also, the introduction of non-testimonial statements does not implicate the Confrontation Clause. *Whorton v. Bockting*, 549 U.S. 406, 420 (2007). The state appellate court determined that Jaquez's statements were not testimonial. (Ans., Ex. 8 at 39.) This determination was reasonable, considering that Jaquez's statements to Burgos do not fall under any category of statements the Supreme Court has designated as testimonial, i.e., statements made during police interrogations,

prior testimony at a preliminary hearing, before a grand jury, or at a former trial. *Crawford*, 541 U.S. at 68. Jaquez's statements arose in a private conversation, made apparently without thought that they would be used by law enforcement. Because these statements are not testimonial, their introduction was not barred by the Confrontation Clause. Finally, because there was no constitutional violation, Petitioner is unable to show that the trial court's denial of his mistrial and new trial motions violated his rights.

Furthermore, Petitioner would not be entitled to relief even if the Confrontation Clause had been violated. All Confrontation Clause claims are subject to harmless error analysis. *See United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004). In the context of reviewing a state court conviction under 28 U.S.C. § 2254, this of course means that relief is in order only if the admission at issue "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted). Relief is precluded here by the strength of the evidence supportive of petitioner's guilt. Burgos testified in detail about the events of the murder, events corroborated by the crime scene found by police, the presence of Petitioner's blood under Tom's fingernails, and the testimony of Ely. Accordingly, Petitioner's claim is DENIED.

C.   Impeachment Evidence

Petitioner claims that the trial court violated his Confrontation Clause and due process right to a defense by excluding impeachment evidence against Burgos:

> Prior to trial Jaquez moved to present as impeachment evidence of prior acts by Burgos that reflected on her "dishonesty and tendencies towards acts of violence and moral turpitude," which included the circumstances of her 1988 convictions for robbery and assault with a deadly weapon: That Burgos approached the victim, solicited for an act of prostitution, and directed him to drive his vehicle to a "dead end," where she produced a handgun and ordered him to give her his wallet, money, and keys; as Burgos's codefendant, Payne, approached the rear of the vehicle, her attention was diverted momentarily, whereupon the victim grabbed the gun, which fired a shot through the driver's side window; after Payne then stabbed the victim several times in the neck and chest, he and Burgos both "fled the scene." Burgos entered a guilty plea to charges of robbery and assault with a deadly weapon after a charge of attempted murder was dismissed. . . .
>
> At a hearing on the motion the defense also asked to offer evidence that while Burgos was incarcerated awaiting trial in the present case

15

> she attempted through her boyfriend Dennis Torres and her attorney to have drugs delivered to her in county jail. The effort was unsuccessful and did not result in charges, but Burgos was subsequently convicted for possession of heroin in jail based on a separate incident. Jaquez argued that the evidence was admissible under Evidence Code section 788 to demonstrate Burgos's "moral depravity," dishonesty, manipulation of others, and propensity to acts of violence.
>
> The trial court granted the motion to impeach Burgos with evidence of the fact of her 1988 robbery and assault with a deadly weapon conviction, and with the 2006 conviction for possession of drugs in San Francisco County Jail, but excluded evidence of the particular circumstances of the offenses and her statements related to the offenses. The "conduct concerning conspiracy to smuggle drugs in San Francisco County Jail" through Burgos's boyfriend and attorney was also excluded.

(Ans., Ex. 8 at 11–12) (footnotes omitted).

The state appellate court rejected Petitioner's claim. Not only was the probative value "outweighed by the confusion of issues and considerable amount of time required to present it," the trial court's decision comported with constitutional requirements. Furthermore, there was no prejudice:

> First and foremost, the defense had both the opportunity and the evidentiary substance to thoroughly challenge Burgos's credibility without the excluded evidence. Not only did the fact of the prior convictions and her admitted use of a firearm during the robbery and assault offenses adequately indicate her violent nature and moral indigence, but her character and testimony were thoroughly challenged with withering and successful attacks on many other levels. She was effectively portrayed as an inveterate drug addict who admittedly sold drugs and "went to great lengths" to have others bring drugs to her in jail. She admitted and the prosecutor conceded that she lied incessantly to the police and to others to further her perceived interests. Testimony was received from others that Burgos was manipulative, controlling, and subject to unruly outbursts. Burgos admitted as much. During closing argument defense counsel stressed her dishonesty, repeated and elaborate fabrications, and palpable moral deficiencies. Further, the extent to which the jury accepted Burgos's testimony was clearly not attributable to the inability of the defense to attack her character or inherent lack of credibility – which effectively occurred – but rather to the corroboration of her version of the murder, particularly by the DNA evidence and Ely's consistent testimony. Thus, while the excluded impeachment evidence may have augmented the showing that Burgos lacked credibility, it was cumulative, and, in our view, would not have produced a perceptibly different impression of her credibility.

(*Id.* at 17–18.)

1  Petitioner's claims lack merit. First, there was no Confrontation Clause violation. The
2 Confrontation Clause guarantees an opportunity for effective cross examination, not cross
3 examination that is effective in whatever way, and to whatever extent, the defense might wish. *See*
4 *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). For instance, the Confrontation Clause
5 does not prevent a trial judge from, as happened here, imposing reasonable limits on
6 cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety or
7 interrogation that is repetitive or only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673,
8 679 (1986). A defendant meets his burden of showing a Confrontation Clause violation by showing
9 that "[a] reasonable jury might have received a significantly different impression of [a witness's]
10 credibility had . . . counsel been permitted to pursue his proposed line of cross-examination." *Id.* at
11 680.

12  Petitioner has not made such a showing. He was able to impeach Burgos with evidence of
13 her prior convictions, her numerous attempts to deceive the police and others, and her overall
14 manipulative, untrustworthy character. Such evidence alone achieves the goal of impeachment,
15 which is to make "a general attack on the credibility of the witness." *Davis v. Alaska*, 415 U.S. 308,
16 316 (1974). Also, because so much compelling impeachment evidence was allowed, petitioner
17 cannot show that the jury would have received a significantly different impression of Burgos's
18 credibility had the excluded evidence been presented. There was, then, no Confrontation Clause
19 violation, and therefore the state appellate court's decision was reasonable.

20  Petitioner's due process claim fails for the same reasons. He was able to present significant
21 impeachment evidence of a key prosecution witness. He has not shown that additional evidence
22 would have in any way affected the outcome of the case.

23  Accordingly, petitioner's claims are DENIED.

24 D.  Cumulative Error

25  Petitioner claims that even if the errors individually do not justify relief, the cumulative
26 effect of all errors resulted in a fundamentally unfair trial. In some cases, although no single trial
27 error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still

17

prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003).

This claim fails because there is only one possible constitutional error, viz., the one underlying supplemental instruction claim. As petitioner has not shown any other errors, there cannot have been cumulative error. This claim is DENIED.

## V. CONCLUSION

The state court's adjudication of Petitioner's claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is **DENIED**.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of Respondents, and close the file.

IT IS SO ORDERED.

Dated: February 13, 2013

_____
EDWARD M. CHEN
United States District Judge